UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

DOUGLAS BROOKS,

Defendant.

Cri. No. 17-CR-131-A

---

# DEFENDANT'S SENTENCING MEMORANDUM

Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
*Attorneys for Defendant*
DOUGLAS BROOKS
2100 Main Place Tower
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com

## PRELIMINARY STATEMENT

Douglas Brooks stands convicted of operating an unlicensed money transmitting business, in violation of Title 18 United States Code §1960. He entered a plea of guilty to this offense on August 3, 2017. Mr. Brooks is scheduled to be sentenced on March 22, 2018.

A strict consideration of the *United States Sentencing Guidelines* reveals the following. His base offense level is 18. Pre-Sentence Investigation Report ["PSR"], as revised March 5, 2018, ¶38. His offense involved the purchase and sale of a virtual currency known as Bitcoin. Because Mr. Brooks acknowledges that the Bitcoins purchased or sold by him were, in part, either the proceeds of unlawful activity or intended to promote unlawful activity, his offense level is increased by a factor of 6. *Id.* ¶39. The unlawful activity at issue was the distribution of controlled substances. There is a further four level enhancement under the *Sentencing Guidelines* due to the fact his activities involved the laundering of funds, as evidenced by his failure to register with FinCEN and his use of the PayPal accounts of three friends for the purpose of sidestepping PayPal's internal measures to prevent the illicit movement of funds. *Id.* ¶40. After being given credit for acceptance of responsibility, the defendant's total offense level is 25. *Id.* ¶¶ 46-48. Douglas has no prior criminal history. *Id.* ¶¶ 49, 53. Without the consideration of any other mitigating factors, at a total offense level of 25 and Criminal History Category of I, and after giving consideration to the statutory maximum for a violation of 18 U.S.C. §1960, he faces a guidelines sentencing range of 57 to 60 months. *Id.* ¶58.

As demonstrated below, Douglas Brooks has no pretensions. He has small town values. He leads a frugal lifestyle, and has never lived beyond his means, even during the approximate 15-month period of his offense conduct, extending from July 2014 through September 2015. His venture into

the Bitcoin marketplace began as a curiosity, but then entered the realm of criminal activity when he knowingly became involved in transactions with purchasers and sellers who were themselves drug dealers. Abusing marijuana on a daily basis during this period, he rationalized the gravity of his wrongdoing, and became blinded by the easy money it generated. To enhance his persona among his customers, he pretended to be experienced using both the Deep Web and Dark Web. The genuineness of this false persona was betrayed by the simplicity of his business model, which included using his own name, telephone number, and email account.

In fact, the overwhelming evidence shows that Douglas Brooks, but for his 15-month venture into the underworld, has exceptionally strong character. His laudable charitable endeavors and individual achievements growing up were nothing short of extraordinary. Those who know him best attest to his core goodness and kind heart.

His arrest in November 2015 was a watershed moment in his life, a devastating experience that has brought out his inner strengths and limitless potential. Despite being a chronic abuser of marijuana, he stopped using this drug immediately. The record shows that he took other actions that, considered as a whole, demonstrate his commitment to doing all within his ability to right the wrong of his criminal behavior. Equally noteworthy has been his dedication to his work with a construction company located in Clarence, NY. Shortly after his arrest, he was hired by Richard E. McNamara, the owner of R.E. McNamara, Inc. Over the past 2+ years, Douglas has performed beyond expectation. As Mr. McNamara attests, Doug is now an irreplaceable component of his business operation, which involves high end home remodeling and construction.

A sentencing option exists in this case which serves all of the purposes outlined in Title 18 United States Code §3553(a), a sentence which would be sufficient but not greater than necessary

to address the important considerations outlined in that statute. Doug's employer has agreed to hold his position at R.E. McNamara, Inc. open for a period of six months in recognition of his vital importance to the business. A split sentence, consisting of six months incarceration followed by six months monitoring and a term of supervised release would serve the interests of punishment and deterrence while, at the same time, preserving Douglas's employment and avoiding the unduly harsh consequences his termination as an employee of R.E. McNamara, Inc. would have upon the business. Again, the record taken as a whole provides ample support for this disposition, and gives due recognition to the extraordinary steps that have been taken by Mr. Brooks since his arrest to make amends for his wrongful behavior.

## I. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Douglas Brooks is 31 years old. PSR at 2. He currently resides in an apartment with his girlfriend, Elise Brooks (no relation), in North Buffalo. *Id.* ¶¶ 70, 72. His father, a retired New York State Corrections Officer, worked at the Attica Correctional Facility at the time of Douglas's birth, and later transferred to the Lakeview Correctional Facility prior to his retirement in February 2003. As such, Doug originally lived with his family in Attica, and later was raised in Fredonia, NY.[1] Following his graduation from Fredonia High School in 2004, Douglas attended Niagara County Community College, where he earned an Associate's Degree in Science in December 2007. PSR ¶81.

---

[1] *See* character letters of Grant and Sharon Brooks, Douglas's father and mother, annexed as part of **Exhibit A**. Character letters prepared on behalf of the defendant are annexed as **Exhibits A** through **D**. **Exhibit A** contains letters from his father, mother, and sister. **Exhibit D** contains letters from his girlfriend and her mother, Michele Brooks. **Exhibit C** contains a letter from his current employer, Richard E. McNamara. **Exhibit D** contains letters from friends of the defendant, arranged alphabetically.

Thereafter, he attended the State University of New York at Buffalo, and was awarded a Bachelor's Degree in Fine Arts in September 2000. *Id.* ¶82.

As the character letter from his mother attests (**Exhibit A**), his childhood and adolescent years were characterized by excellence:

1. He played hockey beginning at age 6.
2. He was both a Cub Scout and later a Boy Scout.
3. At Fredonia High School, he was a member of the hiking club, and also participated on the soccer, tennis, and wrestling teams.
4. He was both an acolyte and altar server at his parish church.
5. He was regularly involved in his parish's youth group, and volunteered both at soup kitchens and food banks.
6. He assisted with yard work for disabled clergy members at the church, and also regularly cleared snow from an elderly neighbor's front porch, always refusing payment for his services.
7. He received the President's Volunteer Service Award for his work at the Westfield SPCA.
8. He was selected by his teachers and school administrators to participate in summer leadership training camps.
9. He spoke to fellow students regarding the dangers of AIDS, and also presented at middle and high school classes as a peer educator.
10. He acted as a peer mediator, addressing conflicts among fellow students.
11. During both middle and high school, he was a member of the Student Council.
12. Douglas also devoted his time to the Big Buddy program, mentoring a middle school student who had no positive male role model at home.

A childhood friend, Jacob Lakas, reports in his character letter (**Exhibit D**) that Douglas was both his defender and confidant as they grew up together. Jacob was born without a portion of his

left arm. He recalls specifically that he experienced great difficulty riding a new bike purchased for him by his parents. "Every day when Doug and I would hang out he would trade bikes with me for the day. I would ride his bike all day and not have to worry about falling off, and we would switch back after we would head home for dinner." *Id.* Another friend, Christopher Prell, reports the following regarding Douglas's charitable nature: "When we worked together I did not have a car or my license and would ride my bike close to 3 miles to work. We often had to work late, sometimes getting out around 11 pm. Doug would always insist on throwing my bike in the back of his four door car and drive me home in the completely opposite direction of his house." Letter of Christopher Prell, annexed as part of **Exhibit D**.

The defendant's strong character is more recently exemplified by the fashion in which he has handled the disclosure of his criminal behavior. Michele Brooks, the mother of Douglas's girlfriend, recounts the following: "When Doug told my husband and me of his serious offense, we could not have been more shocked. He sat down face-to-face with us and spoke to us with great humility and remorse. Despite the gravity of the situation, we were also taken by the fact that he did not rely on our daughter to break the news to us or to soften our opinion. He fully answered our questions – and we had many. He did not make excuses nor did he minimize the seriousness of his actions." Character letter of Michele Brooks, annexed as part of **Exhibit B**.

He displayed similar disarming candor in disclosing his wrongdoing to his current employer, Richard McNamara. He recollects that, at the time of hiring the defendant in late 2015, he posed a series of questions regarding Douglas's background. "I asked him if he had been convicted of a crime. I will never forget how he paused for a moment and with no further hesitation or prodding from me explained that he had in fact been recently arrested and would be convicted of a crime in

the future. He went into detail to me about what had happened. He offered to resign his position if I wasn't comfortable with having someone in his situation as an employee." Character letter of Richard E. McNamara, annexed as **Exhibit C**. Continuing, Mr. McNamara reports that he then questioned why Douglas had been so open, and was informed by the defendant: "He knew that part of his job was going to be involved with my business's money, and that he would be doing bank deposits and have access to company money. He felt that it was only right for me to know his full situation and have a choice whether I was comfortable with it or not. He also told me that he knew this wasn't going to be the last time that he had to explain his actions that resulted in a felony conviction, and that he felt it was smart to get used to explaining it." *Id.*

As noted at the outset of this presentation, Douglas Brooks has no pretensions. He leads a largely unassuming life. The PSR reports that both LexisNexis and Accurint searches have disclosed that the defendant has no assets. PSR ¶98. He has but one bank account in his name, with a balance of approximately $3,500. *Id.* ¶¶ 93, 99. He does not own a motor vehicle, choosing instead to use his mother's 2012 Ford Focus. *Id.* ¶93. The apartment rented by the defendant and his girlfriend costs only $660 per month. *Id.* ¶99. Douglas estimates that he spends only $25 per month for clothing. *Id.* The monthly food expense for him and his girlfriend is $350, meaning they spend less than $100 per week on groceries and meals. *Id.* He holds only two credit cards in his name, having a combined balance of less than $100. *Id.* ¶94.

With the exception of the offense of conviction, and his chronic use of marijuana during that 15-month period, his life is characterized by strength of character, loyalty to friends, and simplicity. He is "small town" in every sense of the term, someone who sadly and in alarming fashion betrayed

these commendable qualities between July 2014 and September 2015. For that, he has paid and will continue to pay a heavy price.

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Michele Brooks, the mother of Doug's girlfriend, Elise, provides an interesting, insightful perspective on how the defendant became immersed in something so terribly wrong over a 15-month period in 2014 and 2015:

> Although I recognize what Doug did was wrong, I sincerely do not believe Doug's intent was to proactively seek out ways to cheat the system. We were not surprised when Doug first became interested in bitcoin investing as a part-pasttime; he enjoyed innovative activities. He was happy to explain to us how the process worked and he shared his excitement in getting into this emerging currency. Seeing how this hobby subsequently led to his current situation is devastating. Over time it seems Doug allowed himself to be drawn into that he knew to be clearly against the law. Doug explained to us that he has no one to blame but himself and that he has accepted full responsibility for his actions and recognizes that he must pay the price for his illegal behaviors.

Character letter of Michele Brooks, annexed as part of **Exhibit B**. That, at the outset, Douglas would have been so open with his family regarding his involvement with Bitcoin lends credence to this viewpoint on Doug's offense.

As to what caused the curiosity to become a crime, two additional factors warrant consideration. His father, Grant Brooks, has opined that Doug "became involved in an attempt to make quick and easy money." PSR ¶73. An additional important circumstance was the effect Doug's daily abuse of marijuana during this period had upon his exercise of good judgment. Throughout this period, he was using marijuana on a daily basis. *Id.* ¶77. Indeed, in a conversation tied to a Bitcoin

transaction on January 3, 2015, Douglas commented that he was "short on trees and my usual people are away. You know anyone around me?" *Id.* ¶21. (The reference to "trees" is to marijuana.)

Douglas's offense statement, which appears in the PSR at ¶36, provides the following insights. He first became acquainted with Bitcoin after reading about the technology online. His purchases and sales of Bitcoin began innocently enough, but he nonetheless continued to engage in this market even though he became aware that this form of currency was being used "for illegal things." He came to understand that the attractiveness of the currency in the drug arena arose from the anonymity associated with its use. "Knowing this I still sold bitcoin, and I wish that I had made a better decision." Tellingly, he remarks that "[o]ne of the things that bothers me about myself most is even though I knew the possibility that the majority of my customers were going to use the bitcoin for illegal things, I still went along and sold them to them" Then, on pages 15 and 16 of the PSR, Douglas identifies three factors that he believes contributed to his illegal behaviors: (1) abuse of marijuana; (2) greed and lack of employment; and, (3) rationalizing that he would never be prosecuted due to the relative smallness of his Bitcoin operation.

The defendant's Bitcoin-related activities involved the movement of a sizable amount of money, between purchases and sales, approximating one half million dollars. PSR ¶32. At the same time, the amount of funds involving criminal behavior, that is, controlled substances, was closer to $150,000. *Id.* ¶33. In all, Douglas's profits from his activities are believed to have been in the neighborhood of $50,000.

For the most part, his Bitcoin transactions ranged in amounts "from a few hundred to a few thousand dollars." *Id.* ¶30. Stated in a different way, he participated in many transactions involving relatively small amounts of money. The lack of sophistication associated with his Bitcoin activities

is illustrated by the fact he took few or no steps to conceal his own identity. For example, on the most commonly used website for transacting Bitcoins, "localbitcoins.com," the defendant's username was "Doug.Brooks." *Id.* ¶¶ 8, 16. Indeed, in the sample advertisement referenced in the PSR, Douglas described himself as "a local Buffalo Bitcoin dude," indicated a preference to meet at a coffee shop in North Buffalo, which he described as "Anywhere public," and provided his own telephone number as a point of contact. *Id.* ¶16. As well, he transacted business using his own email address, which at the time was "douglasbrooks@gmail.com." *Id.* ¶17. The paradox of his manner of doing business is clear. While he engaged in illegal behaviors with individuals he either knew or believed were involved in the purchase and sale of controlled substances, where the use of Bitcoin was an attractive assurance of anonymity, Douglas took no steps to conceal his own identity nor to conduct his Bitcoin-related activity in secret. While this circumstance does not detract from his guilt, it does serve to underscore the simplistic, unsophisticated character of his operation. An illustration of how most Bitcoin operators usually promote their services is annexed as **Exhibit E**. These two excerpts from localbitcoins.com reveal that very few traders use their own names, choosing instead to go by pseudonyms such as "Sonu2k1us," "BORABORA2016," "Coins_for_less," "bitobit," or "coinfarm."

The PSR includes a discussion of the Deep Web and Dark Web at ¶¶ 12 and 13. It is within these nonpublic portions of the internet that most drug activity takes place. Paragraph 18 of the PSR contains a reference to an exchange of messages by the defendant with a potential Bitcoin customer that took place in mid July 2014. In these messages, Douglas acknowledges being aware that drug-related activity takes place on the Deep Web, refers to "reddit.com" as a resource regarding these

activities, reports that all types of drugs are available on the Deep Web, identifies "Agora" as a site on the Deep Web where drugs are transacted, and shares a referral link to the Agora site.

It would be both incorrect and unfair to infer from these messages that Doug ever had an intimate knowledge of the Dark or Deep Web. The information he provided in these messages is readily available to the public. For example, an excerpt from "reddit.com" is annexed as **Exhibit F**. The first of the two excerpts from this site, on page 2, states that "[t]his is a public resource for discussion of DNMs, including vendors and items contained therein. Content on this subreddit may be posted by *anyone*[.]" [Italics in original.] The reference to "DNM" is to Dark Net Markets. Annexed as **Exhibit G** is an article appearing on a site known as "theguardian.com," which describes in detail the steps taken by a journalist to purchase drugs on another now-closed dark net site known as "Silk Road." Annexed as **Exhibit H** is a third example of the publicly available information regarding the workings of the dark net, consisting of an interview conducted by a journalist with a dark net vendor who chose to use the pseudonym "Rain Duck" during the interview. This illustration is taken from a site identified as "motherboard.vice.com." Each of these exhibits demonstrates the public nature of the fashion in which the various dark net sites operate.

At ¶19 of the PSR, reference is made to another conversation between Douglas and a potential customer, which took place on March 23, 2015. The introduction to this message specifically states that "the defendant held himself out to potential customers as being knowledgeable about illegal activities taking place on Dark Web Marketplaces." *Id.* ¶19. As indicated above, the information referenced by the defendant in this message is publicly available and does not require either past access to nor active usage of the Dark Web or Deep Web to know how these internet sites work. The subject matter of the quoted message at ¶19 of the PSR concerns

the sale of medical marijuana on dark net markets. This is not a closely held secret. Annexed as **Exhibit I** is an article taken from a site identified as "vice.com," entitled "Why Is Legally Grown Pot Getting Sold on the Black Market?" The article not only confirms that medical marijuana is sold on dark net markets, but also explains why this takes place. Indicative of Douglas's limited knowledge of these activities on the Dark Web is his use in the cited March 23, 2015 conversation of the qualifying phrases "I figure" and "probably" in commenting upon the availability of medical marijuana on the dark net.

Further evidence that Douglas Brooks was exaggerating his knowledge of activities taking place on the Dark Net and Dark Web in his negotiations with potential Bitcoin customers, and was relying upon information acquired from public sources, is shown at ¶26 of the PSR. Outlined in that paragraph are summaries of four interactions between the defendant and a Department of Homeland Security undercover agent. In particular, subparagraph (b) summarizes a discussion which took place on March 4, 2015. During that exchange, the agent referred to the Dark Web site known as "Agora." In response, Douglas "informed that he was not familiar with it." The agent then referred to the former site known as "Silk Road." In response, Douglas is quoted as having stated "'I tend not to get involved in that stuff too much.'" *Id.* ¶26(b).

The credible evidence demonstrates that Douglas Brooks entered the world of Bitcoin trading out of curiosity. After doing so, it became apparent to him that some of his customers were involved in illegal activity. Rather than withdraw, he continued, going so far as to take advantage of the anonymity offered by Bitcoin in charging an inflated fee for his services. He knew what he was doing was unlawful. On the other hand, to suggest that his Bitcoin trading operation at any time was

sophisticated, or that he was himself an active, knowledgeable operator on either the Dark Web or Dark Net is inaccurate, and not supported by the record.

## III. VALUED EMPLOYEE OF R.E. McNAMARA, INC.

As ¶¶ 84 through 90 of the PSR disclose, Douglas Brooks has a long history of gainful employment, excepting the period of time covered by the instant offense. Dating back to his undergraduate days at the University of Buffalo, he worked as a graphic designer through the Office of Communications. Following his graduation, he worked for two years as a layout artist at Artvoice, followed by another two years as a marketing graphic designer at Macs Antique Auto Parts. He next was employed as a web designer for Pool Supplies Plus for approximately one year. Following three months of unemployment, he then worked for another year as a graphic designer at Rosen Publishing. He was then unemployed for a period of approximately one year, until his arrest in November 2015. He supported himself during this period through his Bitcoin activities.

Doug's father, Grant, pointedly remarks in his character letter that he is "disappointed and angry at my son's actions." Character letter of Grant Brooks, annexed as part of **Exhibit A**. After addressing Douglas's acceptance of responsibility and expressions of remorse, Mr. Brooks observes that his son "seems to be more motivated than ever to succeed and has the drive to make things right however he can." *Id.* Mr. Brooks then observes the following:

> Days after being arrested he found gainful employment at a new company and has worked there for two years never missing a day of work. He has received two promotions and multiple raises in that time and is constantly growing in a field that he had no experience in prior to getting the job. He has carved out a successful career despite the consequences for his previous actions hanging over his head.

*Id.* A veteran of 28 years as a corrections officer, Grant Brooks is not one to mince words. His letter addressing his son's actions is brutally candid. That same candor carries over to his observations regarding Douglas's commendable actions following his arrest. Other evidence of record in this case supports those observations.

For example, Michele Brooks, the mother of Doug's girlfriend, Elise, is a mental health professional, who also worked for 15 years as a Certified Public Accountant. Mrs. Brooks conveys an objective, analytical tone in her character letter, which is annexed as part of **Exhibit B**. Tasked, along with her husband, Eric, himself a retired CPA, with looking out for the best interests of their daughter, they have determined it to be appropriate to consent to the continuation of her long term relationship with the defendant. In her words, "we have the strongest confidence in Doug, without reservation, to lead a lawful and productive life, and, as a testament to this belief, we would be proud to have him continue in our daughter's life – even as our son-in-law." Character letter of Michele Brooks, annexed as part of **Exhibit B**.

It is against this backdrop, as well as all the other evidence of record in this case, that we request the Court consider the following. The character letter of Richard E. McNamara is annexed as **Exhibit C**. As noted above, Mr. McNamara is the owner and operator of R.E. McNamara, Inc. His company, which handles high end home remodeling and construction services, has been in existence since 1976. By way of background, Mr. McNamara is also a member of the Town of Clarence Zoning Board of Appeals, the treasurer of a snowmobiling organization, and a 20-year tenured youth hockey coach. He is a man of substance.

Mr. McNamara took a chance on Douglas Brooks a little over two years ago. He did so notwithstanding Douglas's disclosure of his criminal acts, and impending felony conviction. He took

a chance on the defendant because he was so impressed with his candor and honesty regarding his past actions. He no doubt was also impacted by Douglas's past work experience and educational record.

Having worked with the defendant for slightly more than two years, Mr. McNamara makes an extraordinary commitment in his letter. He describes the "huge impact" Douglas Brooks has had upon his business. He states that "[l]osing him for any amount of time will have a negative effect on my business and fellow employees. Due to the multitude of functions and responsibilities he holds, it is not feasible for me to replace him." *Id.* Continuing, he states that he has "extended an offer to Doug to hold his position for up to six months and use freelancers so that he can come back to work for me." *Id.* Mr. McNamara remarks that it would take two people to replace Doug's drafting capabilities. But, the defendant's contributions to Mr. McNamara's business do not end there. His correspondence identifies the following additional responsibilities shouldered by Douglas Brooks:

- Controlling the purchasing of all cabinet components.
- Monitoring the shipping and receiving components for all cabinetry and raw materials.
- Working with vendors and salespeople to ensure fair pricing on materials.
- Quoting window, door, and cabinet jobs.
- Operating websites for three different businesses.
- Providing technical support for all office computers, telephones, email servers, and bookkeeping systems.
- Implementing and overseeing product sales through Amazon.
- Invoicing and billing customers.

- Entering payables and readying them for payment.

*Id.* at 1-2. Noting that his company is known for its attention to detail as to all facets of its operation, Mr. McNamara states that Douglas fulfills this need. "I do not know what I would do without having him working for me." *Id.*

Douglas also demonstrates a supreme work ethic. He "works like a man who has something to prove. Doug never misses work." *Id.* He never arrives late, remains busy throughout the day, and "is often the last person to leave the office." *Id.* There is no job assignment he will decline, no matter how menial. "He loads, unloads trucks and drives them for delivery, prepares materials and helps the cabinetmakers in the shop with a genuine curiosity and respect. He is always ready to unload a truck, lend a hand to another worker, or learn a new skill." *Id.* at 3.

Perhaps most noteworthy is Mr. McNamara's closing comment:

> I remember telling Doug on the day he told me about his charges that the day he was arrested would be a turning point in his life. I told him that he needed to use his offence [*sic*] and remorse as a motivator. I have seen firsthand that Doug has taken this advice to heart. It is my hope that Doug can continue working for me and help me grow my business, and I can continue to see him grow professionally.

*Id.*

Before the Court is a young man who has shown in every way possible since his arrest in November 2015 that he is committed to doing all within his power to make amends for his criminal conduct. The accompanying character letters uniformly demonstrate his acceptance of responsibility and demonstration of genuine, overwhelming remorse for his criminal acts. He has abruptly ended his misuse of marijuana, and has tested negative for all controlled substances since his arrest. PSR ¶5. He has committed himself completely, without any reservation, to his work, so much so that his

employer, Mr. McNamara, has expressed a willingness to leave his position open for a period of six months because the defendant is so indispensable to his business operations. It is requested that the Court, taking into consideration the entire record in this case and all arguments of counsel, impose a sentence of six months incarceration, which will serve the dual needs for deterrence and punishment, to be followed by a period of six months monitoring and such period of supervised release as the Court deems necessary. The credible, reliable evidence in this case fully supports this disposition.

## CONCLUSION

Before the Court is a young man who demonstrates, with the exception of a 15-month period during calendar years 2014-2015, strong character, an impeccable work ethic, and an exemplary commitment to good works. He does deserve to be punished for his wrongful actions; however, he has earned by his actions, particularly his post-arrest actions, an exercise of leniency that enables him to retain his current position of employment with Richard McNamara's company. A term of six months incarceration, followed by six months monitoring and a term of supervised release to be determined by the Court, will properly serve all of the sentencing considerations enumerated in §3553(a) of the Federal Criminal Code. It is respectfully requested that this disposition constitute the sentence of the Court.

Dated: Buffalo, New York
March 8, 2018.

**/s/ Rodney O. Personius**
Rodney O. Personius, Esq.

PERSONIUS MELBER LLP
*Attorneys for Defendant*
DOUGLAS BROOKS
2100 Main Place Tower
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com

TO: AUSA Wei Xiang
U.S. Attorney's Office
Federal Centre
138 Delaware Avenue
Buffalo, NY 14202
(716) 843-5700
Wei.Xiang@usdoj.gov

USPO Tina Blackman
U.S. Probation Office
Robert H. Jackson U.S. Courthouse
2 Niagara Square
Buffalo, NY 14202.

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of March, 2018, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to the following:

AUSA Wei Xiang
U.S. Attorney's Office
Wei.Xiang@usdoj.gov

And, I hereby certify that I have mailed by the United States Postal Service the document to the following non-CM/ECF participants:

USPO Tina Blackman
U.S. Probation Office
Robert H. Jackson U.S. Courthouse
2 Niagara Square
Buffalo, NY 14202.

**/s/ Rodney O. Personius**
Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
*Attorneys for Defendant*
DOUGLAS BROOKS
2100 Main Place Tower
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com